## Moers, &c., *versus* The City of Reading.

1. An Act of the legislature authorizing a city corporation to subscribe to the stock of a railroad company is constitutional.

2. Article 1, section 25, of the constitution of 1838, viz., provides that "no corporate body shall be hereafter created, renewed, or extended, with banking or discounting privileges, without six months previous public notice of the intended application for the same in such manner as shall be prescribed by law," &c. "No law hereafter enacted shall create, renew or extend the charter of more than one corporation:" Whether these provisions are applicable to other private corporations than banks not decided—but it was *Held*, that the same is not applicable to public political corporations, and therefore does not apply to an Act which increased the stock of the Lebanon Valley Railroad Company, authorized its officers to borrow money to construct a branch railroad, and also authorized the corporate authorities of the city of Reading, the county of Lebanon, and the borough of Lebanon to subscribe to the stock of the said company.

3. The constitution, like other instruments, is entitled to a construction as nearly as may be in accordance with the intent of its makers.

4. Increasing the privileges of municipal corporations, or assigning to them new duties, is not an *extension* of their charters within the meaning of the constitution.

5. The uniform construction given to a provision of the constitution by the legislature, with the silent acquiescence of the people, including the legal profession and the judiciary, and the injurious results which would ensue from a contrary interpretation, are proper elements of a legal judgment on the subject.

[Moers *v.* City of Reading.]

· 6. The Act of Assembly of 5th April, 1853, provided that in case the "*corporate authorities* of the city of Reading shall propose to subscribe to the stock · of the Lebanon Valley Railroad Company, it shall be their duty to fix upon a time for holding the election hereby authorized," giving public notice as provided, the notice to state the number of shares proposed to be subscribed; and the qualified voters shall vote, &c., and if at such election a majority of the votes polled are *in favor* of the subscription aforesaid, then and in that case the same shall be made; but if the majority of the votes polled shall be *against* the subscription, then the same shall not be made:" *Held,* that this was an exertion of legislative power, and not a mere delegation of it to the citizens of Reading.

7. Besides, the legislature in the Act incorporating the city of Reading had the right to prescribe how its municipal affairs should be administered; and though they provided that it should be done by select and common councils, they had the right, by a subsequent Act, to alter the charter by diminishing the power of the councils and increasing that of the people; and this is the effect of the legislation in question.

8. It was not the duty of the select and common councils of the city of Reading to meet *separately* and deliberate upon and decide the question of such subscription, before ordering an election.

THIS was a bill in equity presented and filed in the Supreme Court at Harrisburg, in June, 1853, at the instance of John F. Moers, Lewis Briner, and others, who were represented to be owners of real and personal estate within the limits of the city of Reading, in the county of Berks, Pennsylvania, and tax-payers and citizens of said city, acting on behalf of themselves, and all other citizens and tax-payers of said city who shall come in and contribute to the expenses of the suit, against the Mayor, Alder' men, and Citizens of Reading; Isaac Eckert and other citizens of Reading; and the Lebanon Valley Railroad Company.

Complaint was made against a subscription proposed to be made on the part of the city of Reading to the stock of the Lebanon Valley Railroad Company. The subscription was proposed to be made under the authority of an Act of Assembly of 5th April, 1853, which was a supplement to an Act to incorporate the Lebanon Valley Railroad Company, which was approved on 1st April, 1836.

The *first* section of the Act of 5th April, 1853, provides, " That the capital stock of the Lebanon Valley Railroad Company be increased to thirty thousand shares of the par value of fifty dollars" —and authorizes the directors to borrow money not exceeding one million of dollars, and to issue bonds therefor, secured by mortgage upon the road.

In the second section it was provided, " That it shall be lawful for the corporate authorities of the city of Reading, the county of Lebanon, and the borough of Lebanon, to subscribe for shares in the capital stock of the Lebanon Valley Railroad Company, not exceeding six thousand shares for the city of Reading, and four thousand for the county of Lebanon, and two thousand shares for

the borough of Lebanon; to borrow money to pay therefor, and to make provision for the payment of the principal and interest of the money so borrowed; the certificates of loan or bonds which may be issued by the said corporation bearing an interest of six per cent. per annum, payable half-yearly, may be received as cash by the said Lebanon Valley Railroad Company in payment of any part or the whole amount of the shares subscribed by the corporation issuing said certificates or bonds."

By the third section of the same Act of Assembly it was further enacted, "That in case the constituted or corporate authorities of the city of Reading, the county of Lebanon, or the borough of Lebanon, shall propose to subscribe to the capital stock of the Lebanon Valley Railroad Company, as aforesaid, it shall be their duty to fix upon a time for holding the election hereby authorized, giving at least four weeks' public notice thereof, in two or more newspapers published in the limits of the district in which it is proposed to make such subscription, which notice shall also state the number of shares proposed to be subscribed; and the qualified voters at such election shall vote a written or printed ticket, containing the words, 'For the subscription,' or 'Against the subscription,' and if upon counting the votes it shall appear that a majority of the votes polled are in favor of the subscription aforesaid, then and in that case the same shall be made, and shall be valid and binding upon the proper district; but if the majority of the votes polled shall be against the subscription, then the same shall not be made."

By the ninth and last section it was provided, That it shall be lawful for the said Lebanon Valley Railroad Company to construct and use a branch railroad from the borough of Lebanon to a point at or near Cornwall in the county of Lebanon.

In the bill it was, *inter alia*, represented, That by an Act of Assembly passed the 16th day of March, 1847, entitled "An Act to incorporate the borough of Reading, Berks county, *into a city*," it was enacted "That the inhabitants of the borough of Reading, in the county of Berks, as the same extends and is now incorporated, are hereby constituted a corporation and body politic, by the name and style of 'The Mayor, Aldermen, and Citizens of Reading," &c.

By the sixth section of the said Act it was provided, That the freemen of the city of Reading should meet in their several wards and elect by ballot for their several wards so many persons as the said wards severally might be entitled to, to be members of the common council for the said city, and also one person of each ward to be a member of the select council for the said city.

And by the tenth section of the same Act it was enacted, That the said select and common councils, in common council assem

[Moers v. City of Reading.]

bled, shall have power to borrow, for the use of the said city, any sum or sums of money which they shall deem necessary, and to issue certificates of loan for the amount so borrowed, to the persons respectively lending the same; and the said certificates, signed by the Mayor of the said city, and attested by the presidents of the select and common councils, shall be binding and obligatory on the said corporation : *Provided*, That the sums of money so borrowed shall not in the whole, including the sums heretofore borrowed for the use of the borough of Reading, for the re-payment of which the faith of the said borough is now pledged, exceed the sum of seventy thousand dollars; and the said councils, in common council assembled, shall have power to lay and collect taxes within the limits of the said city, for the purpose of carrying into effect the by-laws, rules, and ordinances of the said city, and for the re-payment of all loans with the interest thereon, heretofore made for the use of the borough of Reading, for the re-payment of which the faith of the said borough is now pledged; and for the re-payment of all loans, with the interest thereon, hereafter to be made for the use of the said city, for the re-payment of which the faith of the said city shall hereafter be pledged : *Provided*, That the assessment of such taxes upon real or personal property, shall be made upon the valuation of property taken for the purposes of county rates and levies : *And provided*, That the taxes levied any one year shall not exceed one per cent. upon such valuation," &c.

Also, that on the 10th day of May, 1853, the select and common councils of the city of Reading, at a *joint* session of said councils, passed the following resolution :

*Resolved*, That an election to decide for or against a municipal subscription of two hundred thousand dollars, or four thousand shares, in the stock of the Lebanon Valley Railroad Company, be held in the city of Reading on Wednesday, June 15, 1853, as directed by the Act of Assembly, and that notice of the same be given by the clerk in one English and one German paper, published in the city of Reading on Tuesday next.

It further appeared that an election was held on the 15th June, 1853, and resulted in 1658 votes for the subscription, and 682 against it. In the bill the belief was averred that the corporate authorities intended to subscribe for 4000 shares of the said stock, and to borrow money and issue certificates of loan or bonds therefor. It was averred that the Act of April 5, 1853, was *unconstitutional*, inasmuch as it delegates to the people of Reading the power to bind the city for the payment of fifty dollars for each share of stock subscribed not exceeding 6000 shares. It was further represented that the Act of 5th April, 1853, contemplated that *the corporate authorities* of the city of Reading should assume the responsibility

Moers *v*. City of Reading.]

of proposing to subscribe to the stock of the said company; but that they had made no proposition on the subject, though the select and common councils at a joint meeting passed the resolution of the 10th May, cited. It was averred that the select and common councils were not authorized by the Act of incorporation to assemble in *joint meeting* for any other purpose than those mentioned in that Act, to wit, for the purpose of organization, on the Friday next after any election of select and common councilmen, agreeably to the seventh section of the Act of incorporation; and also for electing city officers other than Mayor and City Treasurer, agreeably to the 11th section of the said Act. It was requested that answers be made to interrogatories proposed as to the subjects complained of and matters connected with the complaint. It was alleged that the subscription for 4000 shares of the said stock at $50 per share, amounting to $200,000, would be injurious to the credit of the city, unjust and oppressive to the complainants and others, and be without authority of law.

It was asked, that the corporate authorities of the city be enjoined and ordered not to subscribe to the said stock, &c.: and the Lebanon Valley Railroad Company be enjoined not to receive or dispose of any certificates of loan or bonds that may be issued by the corporate authorities of the city, and to grant a writ of subpœna to the parties complained against to appear and answer, &c.

The bill was subsequently amended in the following particulars:

That by the Act of Assembly of April 5, 1853, referred to in said bill, and made part thereof, the capital stock of said Lebanon Valley Railroad Company is increased from fifteen thousand shares to thirty thousand shares, at the par value of fifty dollars per share:

That the said company are, by the same Act, authorized to borrow as much as one million of dollars for the completion and equipment of said road, and to issue therefor the bonds of the said company, secured by mortgage upon the said road:

That twenty-three new commissioners are appointed in said act, and that said company are authorized to construct and use a branch railroad from the borough of Lebanon to a point at or near Cornwall in the county of Lebanon:

That the *same* Act of April 5, 1853, extends the charter of the city of Reading by authorizing the corporate authorities thereof, in the event of a majority of votes being polled at an election thereby authorized, in favor of subscription, to subscribe for shares in the capital stock of said railroad company, not exceeding six thousand shares, which at $50 per share amounts to *three hundred thousand dollars;* to borrow money to pay therefor and to issue certificates of loan or bonds therefor, as already mentioned in complainants' bill: Whereas by the charter of said city of Reading the corporate authorities, to wit, the councils of said city, are authorized to bor-

[Moers v. City of Reading.]

row money and issue their certificates therefor, to an amount not exceeding *seventy thousand dollars.* That by the same Act of April 5, 1853, the said city of Reading, if the corporate authorities thereof should subscribe 4000 shares of stock, would be authorized to elect one director of said company; and any two or more corporations, which should together hold 4000 shares of stock in said company, may unite and elect one director thereof, which director should be in addition to the number authorized by the Act of April 1, 1836, to which said Act of April 5, 1853, is a supplement:

That the aforesaid extension by the said Act of April 5, 1853, of the charters of the said Lebanon Valley Railroad Company and of the city of Reading hereinbefore mentioned, are in direct violation of the 25th section of article first of the amended constitution of Pennsylvania of 1837–1838, which provides that "No law thereafter enacted shall create, renew, or extend the charter of more than *one* corporation," and for these reasons, as well as those already mentioned in complainants' bill, the said Act of April 5, 1853, is unconstitutional, inoperative, and void; besides, the legislature had no power to create a debt, and to make it a lien on the property of the citizens of Reading, without the consent of all the citizens, nor without such consent could they make the citizens of Reading corporators in a trading company: Especially could they not do so without providing compensation for losses which might be sustained thereby:

That the said Lebanon Valley Railroad Company has been incorporated: That the existing debt of the city of Reading is $52,600, and was the same at the time of the filing of the bill aforesaid, to wit, June 16, 1853:

That said complainants are all citizens and tax-payers of the city of Reading, and all, or nearly all of them, owners of real or personal estate in said city; and the taxable inhabitants of said city, June 16, 1853, were 3699, or thereabouts.

Interrogatories were submitted: the 11th was as to the terms of the Act of 1853, as stated; 12th, whether the Lebanon Valley Railroad was incorporated; and 13th, as to the amount of the debt of the city of Reading on 16th June, 1853, and the number of taxables of the city at that time.

In the *answer* of the respondents it was averred that by the 9th section of the Act of 16th March, 1847, to incorporate the *city* of Reading, it was enacted "That the power of the said corporation of the said city shall be vested in the said select and common councils, who shall, in common councils assembled, have full power and authority to make, ordain, constitute, and establish such and so many laws, ordinances, regulations, and constitutions (provided the same shall not be repugnant to the laws and constitution of

the United States, or of this Commonwealth) as shall be necessary or convenient for the government and welfare of the said city, and the same to enforce, put in use and execution by constables, watchmen, and other proper officers (whom they shall have power to appoint and remove at pleasure), and at their pleasure to revoke, alter, and make anew, as occasion may require, *and shall have, hold, and enjoy, all the powers now vested in the borough of Reading, which are hereby transferred to, and vested in, the said councils.*"

And it was further averred that the powers there vested in the *borough* of Reading, were defined in part by the 6th section of the Act of Assembly of March 29, 1813, to which Act reference is craved as though set forth, which section is in these words: "And be it further enacted by the authority aforesaid, That it shall be the duty of the said town council, (five of whom shall be a quorum), to hold quarterly meetings on the last Saturdays of April, July, October, and January, in each year, and oftener if necessary, at which meetings they shall revise, repeal, or amend, all such by-laws and ordinances as have heretofore been made in said borough, and enact such other by-laws, and make such rules, regulations, and ordinances, *as shall be deemed by a majority of said council necessary to promote the peace, good order, benefit, and advantage of said borough,*" particularly providing for the regulation of the markets, improving, repairing, cleansing, and keeping in order the streets, lanes, alleys, and highways, ascertaining the depth of vaults, &c., as in and by said Act will fully appear.

By the 13th section it is provided, That the select and common council shall assemble in common councils for the transaction of business, on the last Saturday of every month in the year, and oftener if occasion shall require.

It was farther averred that *the president and directors of the Lebanon Valley Railroad Company* had agreed to pay six per cent. on municipal subscriptions, from the time of payment till the completion of the road. That a written application for a subscription was made to the corporate authorities of the city; and it was averred that on the 10th May, 1853, the select and common councils of the city proposed to make the subscription, and *in joint session,* by a vote of eleven in the affirmative, and three in the negative, passed the resolution relative to the holding an election for or against the subscription for 4000 shares of the stock of the railroad company.

Also that the majority of 972 voters in favor of the subscription, was a majority of all the qualified voters of the city, both of those who voted and of those who did not vote; and that the complainants submitted to the holding of the election, and voted thereat.

[Moers v. City of Reading.]

It was also averred that the terminus of the railroad was in the city, and that the road was designed to increase its business, and render access by the city easy to the country lying west of it.

*Davis, Banks,* and *Smith,* for complainants.—Four questions were raised. The first was that the councils of the city of Reading should separately have acted upon the matter, before the vote of the people was taken. That separate consideration is required by the charter, in all cases, except when the councils organize and when they elect officers. It was said that the power of the *select council* was overcome in the joint session. The action of the councils being against the public interest, should be strictly construed: 3 *Barn. & Ad.* 739, Stourbridge Canal Company v. Wheedly and Others. Any ambiguity in the charter must operate in favor of the public: *Id.*; 4 *Bingham* 452; 11 *East* 685; 11 *Peters* 545; 1 *Harris* 555, Stormfeltz v. Manor Turnpike Company.

2. Exclusive of the Act of 1853 in question, they had no power to bind the citizens of Reading: McDermond v. Kennedy, 6 *Pa. Law Jour.* 66.

It was contended that the Act of 1853 was *unconstitutional.* Though subscriptions sufficient to authorize the charter of a turnpike company were not obtained, a subscriber to the stock cannot without his assent be attached to either of two companies into which the first company was divided by subsequent legislative enactment: 2 *Pa. Rep.* 184, Turnpike Company v. Phillips.

Art. 5 of Amendments to the *Con. U. S.:* No person shall " be deprived of life, liberty, or property without due process of law; nor shall private property be taken for public use without just compensation."

Art. 9, Constitution of Pennsylvania, sec. 9: Nor can he be deprived of his life, liberty, or property, unless by the judgment of his peers or the law of the land. Sec. 10: Nor shall any man's property be taken or applied to public use, without the consent of his representatives, and without just compensation being made.

Art. 7, sec. 4: " The legislature shall not invest any corporate body or individual with the privilege of taking private property for public use, without requiring such corporation or individual to make compensation to the owners of said property or give adequate security therefor, before such property shall be taken."

In the case of Woodfolk v. Nashville C. R. R. Co., *Am. Law Reg.,* July, 1853, p. 550, it was held that nothing but money was a constitutional compensation, not general benefits and advantages: 5 *W. & Ser.* 171, Norman v. Heist, the legislature cannot take the property of one individual and give it to another: 5 *Barr* 145, Bolton v. Johns; 1 *Barr* 223, Menges v. Wertman; 6 *Barr* 86, Brown v. Hummel; 9 *Barr* 108, Dale v. Medcalf; 4 *Harris* 256, Ervine's Appeal; 1 *Jones* 489; 3 *Harris* 18, Chastellux v. Fairchild.

Compensation for private property taken for public use, should be made : *Vattel* 112 ; *Rutherford* 43 ; *Burlem.* 150 ; *Puff.* 829 ; *Grot.* 333 ; 1 *Bald.* 205, 222–223 ; 12 *Ser. & R.* 375, Eakin *v.* Raub ; 2 *Kent* 339, note ; 2 *John. Ch.* 162. It was contended that the Court should restrain the defendants until security was given to the citizens of Reading against loss by reason of the subscription, &c.

The legislature does not possess all the powers of the people, but only powers delegated to it by the people, and which are the powers necessary for the legislature of a free state : ROGERS, J., in Pittsburgh *v.* Scott, 1 *Barr* 309. The road in question was not *necessary*. It may not come to Reading, but only "near Reading." The case of Commonwealth *v.* McWilliams, 1 *Jones* 70, is not in point. It arose under the general law of 1834, as to taxation. But the city charter of Reading limits its indebtedness to $70,000, and the Act of 1853 greatly enlarges it. The case of Commonwealth *v.* McWilliams has not sufficient authority to support it.

3. It was contended that the Act of 5th April, 1853, was unconstitutional, because, by the 3d section, the subscription is to depend on the vote of the people. This was said to be unfinished legislation, or legislation by the people ; 6 *Barr* 507, Parker *v.* Commonwealth ; 8 *Barr* 391, Com'th. *v.* Judges. Voting for a subscription to the amount of $200,000 was an exercise of *sovereignty*. It affects the property of the citizen, and is legislation.

4. The Act of 5th April, 1853, is in conflict with the provision of 25th section of the 1st article of the state constitution, viz. "No law hereafter enacted shall *create, renew,* or *extend* the charter of more than one corporation." It was said that this provision was a general provision applying to all corporations, notwithstanding its connection with provisions regulating *bank corporations.* That its terms are general. The proceedings in the Convention were referred to, to support the argument that it was understood by the Convention to be a general provision applying *to all corporations.* It was said that the constitutional provision was violated by the Act of 1853 in extending *three* charters if not *four*—viz. 1. The charter of the Lebanon Valley Railroad Company ; 2. That of the city of Reading ; 3. Of the borough of Lebanon ; 4. Of the county of Lebanon.

It was in conclusion observed, in relation *to the election,* that though a majority of all the votes polled were in favor of the subscription, yet that the votes in favor of the subscription was not a majority of the whole number of voters of the city of Reading.

*Campbell* and *Strong,* for defendants.

Is the act *constitutional ?* This involves several questions.

1. Can the legislature, without violating the constitution, au-

[Moers v. City of Reading.]

thorize a subscription by a municipal corporation to the stock of a railroad or turnpike Company? Authorities in support of such legislation were referred to, viz.: 8 *Leigh* 120; 9 *B. Munroe* 526; 15 *Conn.* 475; 9 *Humph.* 252; 5 *Gilman* 405; 20 *Ohio* 609; *Id.* 625; 4 *Comstock* 419; 3 *Grattan* 247; 21 *Ohio* 77; *Id.* 105; 24 *Wend.* 65; 1 *Jones* 61, Com'th. v. McWilliams.   There is no *taking* of property in this case. The taking of property mentioned in the constitution is the taking of it entirely, not a consequential injury to it: 6 *Wharton* 46.

It should not be assumed that the stock of the company will prove worthless, and that taxes will have to be laid to pay it. But if so, it is not the *eminent domain* of the Commonwealth which is exerted, but the *taxing power*.

2. If the power in question exists, may the legislature, without violating the constitution, provide that its exercise be dependent upon the vote of the citizens of the corporation? As to the case of Parker v. Com'th., 6 *Barr* 507, and of Rice v. Foster, 4 *Harrington* 479, it was observed that the point decided in those cases was, that the legislature could not delegate to the people the power to make laws; but that the case of Parker recognises the distinction between a condition in law, valid under the constitution, and a *transfer* by the legislature of its functions: 6 *Barr* 526–7. A statute takes effect as a law upon its passage; whether the municipal corporation will exercise the privilege granted, is left to the determination of the majority. The Act of 5th April, 1853, delegates no legislative power. It operates *proprio vigore;* it confers larger powers, submitting the question of their exercise to the people. But whether exercised or not, it remains a law: 8 *Barr* 391, Com'th. v. Judges, relating to a new township; 10 *Barr* 215, Com'th. v. Painter, in reference to the site for the public buildings of Delaware county. It was submitted, that no clause of the constitution renders invalid an amendment or enlargement of a municipal charter subject to its acceptance by a vote of the citizens.

3. But if the provision in the 3d section of the Act of 1853 in reference to the election, be unconstitutional, it was submitted whether the previous section, authorizing the subscription was not valid. A statute may be unconstitutional in part, and the remainder valid: 2 *Peters* 526. The *second* section is complete in itself. It authorizes the subscription; and the third section applies to the condition upon which the power granted may be exercised.

4. Is the Act unconstitutional by reason of its granting *additional* powers to the railroad company, and also authorizing the proposed subscription? It was contended that the clause in the constitution forbidding the creating, renewing, or extending the charter of more *than one corporation* by one law, did not refer to

*municipal* coporations. Secondly, that it applies only to such acts as *create* a corporation, or *prolong the duration of an existing one.* That any other construction would disable the legislature from passing any *general* law affecting the powers of either municipal or private corporations. That the Act of 1853 (even if a municipal corporation be within the constitutional provision) does not *create* the charter of any corporation, nor *renew* one: and that it did not *extend* the charter of any, it being contended that the phrase "extend the charter," applies only to the *duration* of the franchise. It was alleged, that since the adoption of the amended constitution, many laws have been passed creating one corporation and enlarging the powers of another; or enlarging the powers of *two* corporations, both municipal and private. A list of some of the Acts which would be invalid upon such a construction, was submitted. The list contained above two hundred and seventy Acts.

Further: was the action of the corporate authorities of Reading justified by law? and if not, what is the consequence of any irregularity on their part?

The power was given to corporate authorities to subscribe. The legislature, however, indicated its will, that the subscription should not be made, unless a majority of the qualified voters should approve. The object of the legislature obviously was to obtain the popular opinion. It is not denied that the opinion has been obtained; those affected by the subscription have by more than a two-thirds vote approved the subscription. Equity looks at the substance, the form is nothing. But the complainants are estopped; they submitted to the election without complaint; and even if there were irregularity in ordering the election, they cannot complain. *They voted at the election.*

But the provisions of the Act of April 5, 1853, are *directions* in regard to the mode in which the election should be ordered. The councils were to act *ministerially* to obtain the popular judgment. The result is not affected by a failure to comply with the directions. In the case of Lyon & Smith (contested election 110), no notice had been given to some towns of the election: it was decided that the want of notice did not invalidate the election. The popular will is the *substance:* the mode of obtaining it is only *form* and *direction.* If the statute be regarded as conditional, the condition was, that the people should approve: not that notice of the election should be *written* or *printed,* or that A. or B. should publish the advertisement of the election. The time of approval, or the time of *proposition* to subscribe, is immaterial. This may be as well after the election as anterior to it: the legislative design was to obtain the popular judgment.

Nor is it clear that the fact that the city councils met in *joint* meeting was irregular. For some purposes they are authorized to

[Moers *v.* City of Reading.]

meet in joint meeting, and probably for others in separate session. From the *ninth* section it appears that the duties of the select and common councils, when acting separately, are to "*ordain, constitute,* and *establish* such and so many *laws, regulations,* and *constitutions* as occasion may require. It was submitted, that fixing the time of holding an election is not embraced in these powers given to the councils acting separately. The Act of April 5, 1853, conferred new powers, but did not provide whether they shall be exercised by councils acting jointly or separately. But. the fundamental inquiry is, Has the popular sense been obtained?

7 *Alabama* 114, Clifton *v.* Cook, where an election was ordered by the legislature of Alabama, to determine upon the site of a courthouse, and an election was had, in which a majority of the legal votes were cast in favor of a particular place : It was held, that it ought not to be disturbed because of some informality or irregularity in the mode of holding it.

The opinion of the Court, filed Sept. 8, 1853, was delivered by

BLACK, C. J.—By an act of the legislature, passed April 5, 1853, supplemental to the charter of the Lebanon Valley Railroad Company, that corporation was authorized to increase its capital, to borrow money, to construct a branch, and to pay interest to its stockholders until the work was finished. The same act provided that the corporate or constituted authorities of Reading city, Lebanon county, and Lebanon borough, might subscribe for shares in the stock of the company. It was further provided that in case the constituted authorities of the city, borough, or county aforesaid should propose to make such subscription, they should fix upon, and give notice of a time for holding a public election, at which the people might vote for or against the subscription, which should be valid if a majority was for it, and otherwise should not be made. On the 10th of May last, the select and common councils of Reading met in joint session, and by a joint vote adopted a resolution, that an election should be held on the 15th of June, "to decide for or against a municipal subscription of two hundred thousand dollars." The election was had, and resulted in favor of the measure by a majority of more than two to one. This bill is brought to restrain the corporate authorities from making the subscription.

The injunction is claimed on four different grounds, which may be stated as follows : 1. All laws authorizing subscriptions by municipal bodies to the stock of railroad companies, are unconstitutional and void. 2. This particular act is void, because it extends the charter of more than one corporation. 3. The act is void, for the further reason that it delegates legislative power to the people of Reading. 4. Supposing the law to be in itself constitutional

[*Moers v.* City of Reading.]

and valid, it has not been properly complied with by the corporate authorities, inasmuch as they did not propose to subscribe before the election of the people was ordered. I shall consider these points in their order.

I. The first one has been already decided in the case of Sharpless *v.* Philadelphia. However easy it may be to demonstrate that public debts ought not to be created for the benefit of private corporations, and that such a system of making improvements is impolitic, dangerous, and contrary to the principles of a sound public morality, we can find nothing in the constitution on which we can rest our consciences in saying that it is forbidden by that instrument.

II. The constitution, in sect. 25 of art. 1, provides that "no corporate body shall be hereafter *created, renewed,* or *extended with banking or discounting privileges,* without six months' previous notice of the intended application for the same, in such manner as shall be prescribed by law. Nor shall any charter, *for the purpose aforesaid,* be granted for a longer period than twenty years, and every such charter shall contain a clause reserving to the legislature the power to alter, revoke, or annul the same, whenever in their opinion it may be injurious to the citizens of the Commonwealth, in such manner, however, that no injustice shall be done to the corporators. *No law, hereafter enacted, shall create, renew, or extend the charter of more than one corporation.*" It is insisted that the last clause of this section is violated by the law before us, inasmuch as it extends the charters of the railroad company and of the city of Reading, as well as those of the county and borough of Lebanon.

The object of this section seems to have been a restraint upon the chartering of banks. Whether it can be made to cover the case of other private corporations, is a question which need not now be determined. But there is not the least reason to believe that public political corporations were in the minds of the convention when the amendment was agreed on, or thought of by the people when they adopted it. It was meant to meet a well-known evil, much discussed at the time, as well as before and since, and not to prevent what nobody ever thought to be wrong. *Qui hœret in litera hœret in cortice* is a maxim in the interpretation of all laws, the fundamental law among others. The constitution is entitled, like other instruments, to a construction, as nearly as may be, in accordance with the intent of its makers.

Again: it is very far from being clear, that increasing the privileges of corporations, or assigning new duties to them, is an extension of the charter, within the meaning of the constitution. If it be, and if all corporations are included within this prohibition, then no law could be passed authorizing two railroad companies to

[Moers *v.* City of Reading.]

connect their works, or two counties to make a contract with one another, even though it should be to compromise a dispute; because these are powers which in their nature could not be given to, nor executed by one alone.  What is still worse, a general law would be unconstitutional if it gave new privileges to a whole class of corporations.  Is this Court expected to decide, that when the legislature desire to add to the public functions of supervisors, they must pass a separate bill for every township in the state?  Or that the many general laws already passed relating to improvement companies are unconstitutional, and everything done under them void?  We must keep clear of these absurdities, if we can do so, without allowing the constitutional injunction to be disregarded.  Let us see, therefore, if we cannot satisfy the words in another way.

To *create* a charter, is to make one which never existed before.  To *renew* a charter, is to give a new existence to one which has been forfeited, or which has lost its vitality by lapse of time.  To *extend* a charter, is to give one which now exists greater or longer time to operate in than that to which it was originally limited.  I do not say that these words have no other meaning in the English language.  They are not entirely free from ambiguity.  Their signification, like that of other words, must depend much on the context.  But the definitions here given are consistent with the sense *in* which they are, if not always, at least very often used, both in popular and legal phraseology; and to understand them so here is no violation of the *"jus et norma loquendi."*  It is fair to suppose that they are not used in the first sentence of the section with a different meaning from that which they are intended to express in the last.  What, then, do they mean in the first?  The language is, "No *corporate body* shall be hereafter *created, renewed,* or *extended.*"  Though an increase of privileges might be, in some sense, extending a *charter*, it can hardly be said that a *corporate body* is extended in any other way than by prolonging its entire existence.

This construction is not unsupported by authority.  It has not, indeed, received the direct sanction of any express judicial decision.  But the legislature, with many members of the convention in it, has always acted upon this interpretation.  And this has been done with the silent acquiescence of all the people, including the legal profession and the judiciary.  The defendants' counsel has produced us a list of two hundred and seventy-nine acts of Assembly, passed only within the last four years, creating one, and enlarging the powers of another corporation, or enlarging the powers of two corporations, both municipal and private.  Some thousands of such laws have probably been passed since 1838.  If we now declare them to be unconstitutional, and sweep away at

[Moers *v.* City of Reading.]

once all the rights, public and private, which have been acquired under them, we must do an amount of mischief which no man's arithmetic can calculate. This is a proper element of legal judgment on such a subject. We are not to overlook the practice of the legislature, or disregard the consequences of doing so. The law questioned in Norris *v.* Clymer (2 *Barr* 277), was sustained by this Court principally because there had been many laws like it, and rights had grown up under them which it would be mischievous to annihilate. And the Supreme Court of the United States have declared (11 *Peters* 257), that the uniform exercise of an important power almost without question is no unsatisfactory evidence that the power is rightfully exercised.

III. It is argued that this is not an exertion of legislative power by the assembly, but a mere delegation of it to the people of Reading. We cannot see it in that light. Half the statutes on our books are in the alternative, depending on the discretion of some person or persons to whom is confided the duty of determining whether the proper occasion exists for executing them. But it cannot be said that the exercise of such a discretion is the making of the law. New privileges, conferred on a public corporation, need not be absolute and peremptory, so as to force them on the members against their consent. When individuals or corporators are merely authorized to do a thing, the doing of it necessarily depends on their own will; and we can see no reason why the acceptance of a new power, tendered to a public corporation, may not be made to depend on the will of the people when it is expressed by themselves, as well as when it is spoken by the mouths of their officers and agents.

The case of Parker *v.* The Commonwealth (6 *Barr* 507), has been cited, and much ingenuity has been expended in the effort to make the principle there decided cover the facts which exist here. I do not propose to discuss it. In the case of the Cin., Wilm., & Zanesville R. R. Co. *v.* The Commissioners of Clinton County, very recently decided by the Supreme Court of Ohio, and not yet regularly reported, all the authorities which bear on the point, our own among them, are very carefully and ably reviewed. The opinion of the Court contains a full and convincing refutation of the plaintiffs' argument here. When that case and the case of Slack *v.* The Maysville & Lexington R. R. Co., determined by the Supreme Court of Kentucky, shall come to be in the books, they will leave but little more to be expected or desired on the subject.

But there is one view not distinctly taken by either of those courts, which I will add, because it strikes me as very conclusive.

When the city was chartered, the legislature had a right to prescribe, and did prescribe, how its municipal affairs should be ad-

[Moers *v.* City of Reading.]

ministered. They ordained that this should be done by two bodies called the Select and Common Councils. But they had the power to give it a very different organization. They could have made its government as purely democratic as that of Athens, requiring the people in their primary capacity to decide every question for themselves. Having this power at first, and there being nothing to forbid an alteration in the charter of a city, they could afterwards change it so as to increase the power of the people, and diminish that of the councils. This, in point of fact, is all that has been done. The law of 1853 is but an amendment of the charter, and declares that with reference to this affair of a railroad subscription the city shall be governed, not by the councils alone, but by the councils and the people together.

IV. There is another objection to this subscription, which, though comparatively unimportant as a general principle, is much more serious than any of the rest in its effect on this case. The law says that in case the constituted authorities shall propose to subscribe, it shall be their duty to fix upon a time for holding an election, &c. I am of opinion that this made it the duty of the councils to meet separately, to deliberate on the question, and to decide it, before ordering an election—that the people had no more than a veto on the decision of the councils—and that an election before a formal proposal by the constituted authorities is void. Of this opinion also is Mr. Justice LOWRIE. But the three other judges think differently. There is therefore no point in the cause on which a majority is willing to decree an injunction. Such a decree cannot be made either on the first or fourth without basing it on a foundation which the Court decide to be illegal.

The motion for a special injunction is refused.

LEWIS, J., and LOWRIE, J., dissented.