Young et al., Appellants, *v*. Fetterolf et al.

290

Argued December 5, 1935. Before Frazer, C. J., Schaffer, Maxey, Drew, Linn and Barnes, JJ.

*John Robert Jones,* with him *James S. Woods,* for appellants.

*Chester D. Fetterhoof,* for appellees.

Opinion by Mr. Justice Maxey, January 6, 1936:

The Act of April 25, 1933, P. L. 74, makes it unlawful to conduct or engage in any baseball or football game between the hours of 2 P. M. and 6 P. M. on Sunday. The act further provides that if, at the election in 1933, a majority of the electors of any municipality, voting in said election, vote in favor of baseball and football on Sunday between the hours of 2 and 6 P. M., then each municipality other than a township of the second class, shall, by ordinance, and each township of the second class, shall by resolution of the township supervisors, provide for the licensing of baseball and football games to which an admission fee is charged or is incidental on Sunday between the hours of 2 and 6 P. M. The act further provides that at the municipal election in 1933 there shall be submitted, in the manner pro-

vided by the election laws of the Commonwealth, a question in the form prescribed, to determine the will of the electors of each municipality in respect to the playing of these games on Sunday. Separate official ballots, to be furnished by the county commissioners, are also provided for.

On September 22, 1933, appellants, citizens and taxpayers of the County of Huntingdon, filed a bill in equity praying the court to decree the above act unconstitutional, and to issue an injunction restraining the commissioners from carrying into effect its provisions in respect to printing on the official ballots and placing on the voting machines the question prescribed in reference to Sunday ball games. On September 30, 1933, the court below refused a preliminary injunction and dismissed the bill. From the final decree later entered this appeal was taken.

There are four bases for the attack on the constitutionality of this act. These are: (1) that it contains a delegation of law-making power to the electors of each municipality in the Commonwealth; (2) that it is local or special legislation; (3) that it is an amendment of section 1 of the Act of April 22, 1794, and in so amending that act the requirements of section 6 * of article III of the Constitution were ignored; and (4) that the act is unconstitutional because the title does not give fair notice of its subject-matter.

Most of the assignments of error relate to the first proposition, to wit, that the act attempts to delegate law-making power to the qualified electors of the respective municipalities of the Commonwealth. Appellants contend that the statute delegates law-making power in two respects: (1) by conferring upon the electors of

---

* Section 6 reads as follows: "No law shall be revived, amended, or the provisions therof extended or conferred by reference to its title only, but so much thereof as is revived, amended, extended or conferred shall be reënacted and published at length.

political subdivisions the power to determine by ballot whether the statute's prohibition of games will be suspended in those subdivisions; (2) by conferring upon the electors of political subdivisions the power to command the submission to the voters at certain times of the question of the suspension of that game-prohibiting statute.

As to No. 1, the analogy between the powers of the voters to suspend the operation of the statute here in question and the power of the voters to suspend the liquor-license law in question in Locke's Appeal, 72 Pa. 491, 495, is so close as to make the logic of that case of compelling force here. In that case this court held that an act authorizing voters in their own localities to vote "for license or against license" did not breach the constitutional prohibition against delegating legislative power. Mr. Justice AGNEW, speaking for the court, said: "They [the voters] declared their views or wishes and when they did so, it was the fiat of the law, not their vote, which commanded licenses to be issued or not to be issued . . . The legislature in the Act of 1871 have given to the people a law, not a mere invitation; needing no ratification, no popular breath to give it vitality. The law is simply contingent upon the determination of the fact, whether licenses are needed, or are desired, in this ward. And why shall not the legislature take the sense of the people? Is it not the right of the legislature to seek information of the condition of a locality, or of the public sentiment there? The Constitution grants the power to legislate, but it does not confer knowledge. The very trust implies that the power should be exercised wisely and judiciously. Are not public sentiment and local circumstances just subjects of inquiry. A judicious exercise of power in one place may not be so in another. Public sentiment of local condition may make the law unwise, inapt, or inoperative in some places, and otherwise elsewhere. Instead of being contrary to, it is con-

sistent with, the genius of our free institutions, to take the public sense in many instances, that the legislators may faithfully represent the people, and promote their welfare. So long, therefore, as the legislature only calls to its aid the means of ascertaining the utility or expediency of a measure, and does not delegate the power to make the law itself, it is acting within the sphere of its just power." See also McGonnell's License, 209 Pa. 327, 58 A. 615.

In Baldwin Township's Annexation, 305 Pa. 490, 158 A. 272, we held that the act requiring the consent of the state council of education to the annexation of territory to a muncipality did not offend the constitutional provision as to the delegation of legislative power. We there pointed out the distinction between making a law and investing some official or group of electors with discretion in putting or not putting the law into effect. There are many examples in our laws of similar vesting of discretion: A state law confers upon the voters of the respective counties the power to say *whether or not* voting machines shall be used in those counties; the secretary of the Commonwealth is given power by law to decide *what kind* of voting machines may be used. None of these, however, are delegations of legislative powers. Likewise, in the instant case, the power conferred on the voters by the act in question to say whether the law prohibiting baseball and football being played on Sunday afternoons shall be operative in their localities, is not a delegation of legislative power.

Appellants rely strongly upon the recent case of Schechter v. United States, 295 U. S. 495, as supporting their contention that the act here challenged is an unconstitutional delegation of legislative power. The accepted canons of interpretation of provisions of the federal Constitution which are the same or substantially similar to corresponding provisions in our state Constitution, while not necessarily controlling in state forums when provisions in our own Constitution are being

interpreted by us, nevertheless command great respect. The distinction between the Schechter case and the case at bar is obvious. In that case the law challenged provided that "upon the application to the President by one or more trade or industrial associations or groups, the President may approve a code or codes of fair competition for the trade or industry or subdivision thereof, represented by the applicant or applicants, if the President finds (1) that such associations or groups impose no inequitable restrictions on admission to membership therein and are truly representative of such trades or industries or subdivisions thereof, and (2) that such code or codes are not designed to promote monopolies or to eliminate or oppress small enterprises and will not operate to discriminate against them, and will tend to effectuate the policy of this title: Provided that such code or codes shall not permit monopolies or monopolistic practices."

It was further provided that when the codes so submitted to the President by certain groups were approved by him, violation of them became punishable crimes. These codes were also enforceable by equitable proceedings in federal courts. That statute presented a perfect example of an attempt by Congress to delegate its legislative power to "trade or industrial associations or groups" acting with the approval of the President. Under this statute the fiat of these groups, when given presidential approval, became the law of the land. In that case Chief Justice HUGHES, speaking for the court, said: "We look to the statute to see whether Congress . . . in authorizing codes of fair competition has itself established the standard of legal obligation, thus performing its essential legislative function, or, by the failure to enact such standards, has attempted to transfer that function to others." He found that the statute was unconstitutional because by it Congress had attempted to transfer to others the function of establishing standards of legal obligation. If the Pennsylvania

statute we are now considering provided that any group
of persons wanting to play any kind of games on Sun-
day afternoons should draw up a "code" describing
those games and the manner of their playing, and pro-
viding that upon the approval of the Governor such
games would be lawful and anyone interfering with
them should suffer the pains of the criminal law, we
would have a statute analogous in its basic aspects to
the statute held void in the Schechter case. But the
statute before us does nothing of that sort. It confers
upon no group the power to establish any standard of
legal obligation. All legal obligations with respect to
Sunday baseball and football in Pennsylvania were
fully defined by a complete act of legislation. No men
or group of men could add anything to or subtract any-
thing from that law.

Measured by the test of constitutionality acceptable
to the highest court in the land, which is in perfect
harmony with the test laid down by this court in Locke's
Appeal, supra, the Pennsylvania statute now challenged
is constitutional. Our state legislature laid down poli-
cies and established a standard in respect to the playing
of baseball and football on Sunday afternoons. It left
to "selected instrumentalities," i. e., municipal subdi-
visions, "the determination of facts to which the policy
as declared by the legislature is to apply." The statute
recognizes the fact that there are citizens to whom the
playing of baseball or football on Sunday afternoon is
not offensive and others to whom it is. In the language
of the act some citizens are "in favor of baseball and
football on Sunday between the hours of 2 and 6 P. M."
and conversely some citizens are not in favor of such
playing at such times. All citizens are given the right
by law to register at the polls their attitude toward
such playing and the law assures them that their atti-
tude when formally expressed will be respected by the
sovereign Commonwealth. The law in question bears
an analogy in respect to the features upon which it is

challenged, to the Act of March 24, 1927, P. L. 64, providing that "no license to marry shall issue, if either applicant therefor, be under the age of sixteen years: Provided, that a judge of the orphans' court shall have discretion to authorize a license to be issued by the clerk of orphans' court in special cases where one or both persons are under the age of sixteen years." It could as logically be argued that the judge of the orphans' court is engaging in an act of legislation when he formally registers his "favoring" the suspension in a particular case of the prohibition against issuing marriage licenses to persons under sixteen years of age as it can that the voters of a municipality are engaging in an act of legislation when they formally register their favoring of the suspension in their localities of the prohibition against Sunday afternoon baseball and football.

Our national and state courts have never hesitated to strike down statutes which attempt to confer on non-legislative agencies the power to make laws. Laws are rules of civil conduct, and the making of them is a purely legislative act. The determination by some agency when and where those rules shall become operative and when, if ever, their operation shall be suspended, has never been considered a legislative act. For example, when the President suspends the writ of habeas corpus*

---

* Article I, section 9, clause 2 of the United States Constitution provides: "The privilege of the writ of habeas corpus shall not be suspended unless in cases of rebellion or invasion the public safety may require it."

There was a difference of opinion during the Civil War as to whether or not the privilege of the writ of habeas corpus could be suspended by the President without specific authorization by Congress. Edmund Bates, Attorney General in Lincoln's cabinet, rendered an official opinion that the President had such power. The eminent lawyer, Horace Binney, wrote a pamphlet sustaining that view. On March 3, 1863, Congress settled the question of the President's authority to suspend the writ of habeas corpus by expressly granting it to him. The actual suspension of this writ, however, has always been by presidential proclamation.

his act in so doing is not looked upon as an act of legislation though it does make inoperative for the time being and in certain localities a law immemorially used for the protection of citizens. Our own state Constitution recognizes that laws may be suspended by the authority of the legislature, for section 12 of the Bill of Rights provides: "No power of suspending laws shall be exercised unless by the legislature or by its authority." In the act here in question the legislature authorized the voters of the respective municipalities of the Commonwealth to suspend the prohibition of that act.

In Panama Refining Co. v. Ryan, 293 U. S. 388, strongly relied on by appellants, Congress by section 9 (c) of the National Recovery Act attempted to authorize the President to prohibit the transportation in interstate and foreign commerce of petroleum and its products in excess of certain amounts. The Supreme Court held that this was an unconstitutional delegation of legislative power. Chief Justice HUGHES, speaking for the court, said: "Section 9 (c) does not state whether or in what circumstances or under what conditions the President is to prohibit the transportation of the amount of petroleum or petroleum products in excess of the state's permission. It establishes no criterion to govern the President's course. It does not require any finding by the President as a condition of his action. . . . It gives to the President an unlimited authority to determine the policy and to lay down the prohibition, or not to lay it down, as he may see fit. And disobedience to his order is made a crime punishable by fine and imprisonment . . . The Congress left the matter to the President without standard or rule, to be dealt with as he pleased. . . . [The act] permits such a breadth of authorized action as essentially to commit to the President the functions of a legislature rather than those of an executive or administrative officer executing a declared legislative policy."

If our state statute now being considered conferred upon the Governor the power to determine arbitrarily what games should be played in this Commonwealth and when they should be played, and to issue orders accordingly, and if penalties for violations of those orders were also provided, we would have an act analogous to the act declared unconstitutional by the United States Supreme Court in the case just discussed.

The Pennsylvania act now before us is one in which the legislature does not confer on any municipality the power to make laws but only the power to suspend the operation of a law already made. Recognizing the fact that playing ball games between the hours of 2 and 6 P. M. on Sunday while not per se evil, may be objectionable to the majority of voters in some localities and unobjectionable to those in other localities, the legislature said in effect to the voters of the latter localities: "If the majority of you do not like the prohibitions of this law, you may suspend them."

The vesting in certain officials or persons by the legislative branch of the government, of the power to suspend the operation of laws, has more than once received unequivocal judicial sanction. In Field v. Clark, 143 U. S. 649, the Supreme Court of the United States held that "the authority conferred upon the President by section 3 of the Act of October 1, 1890, to reduce the revenue and equalize duties on imports, and for other purposes, (26 Stat. c. 1244, pages 567, 612), to suspend by proclamation the free introduction of sugar, molasses, coffee, tea and hides, when he is satisfied that any country producing such articles imposes duties or other exactions upon the agricultural or other products of the United States, which he may deem to be reciprocally unequal or unreasonable, is not open to the objection that it unconstitutionally transfers legislative power to the President." Justice HARLAN in his opinion in that case said: "The authority conferred upon the President" by the act questioned, "is not an entirely

new feature in the legislation of Congress, but has the sanction of many precedents." The President was described in respect to that act as not making the law. "He was the mere agent of the law-making department to ascertain and declare the event upon which its expressed will was to take effect." The decision in this case was referred to approvingly by the Supreme Court of the United States in the recent Schechter and Panama Refining Company cases, supra.

Our conclusion on this branch of the case is that for the legislature to make a law complete in all its details, but with a provision that the law may be put into effect or suspended in certain localities by an official act carried out as prescribed by law, by the officials or voters of that locality, is not a vesting of legislative power in persons or bodies outside the General Assembly, and therefore it does not breach section 1, article II, of the Constitution.

The second branch of appellants' attack upon the statute as a delegation of law-making power is based upon section 6 * of the act, which provides for future referendums on the question of Sunday baseball and football.

We find no merit in the contention of appellants that the conferring upon the electors of the power to demand

---

* Section 6 provides, inter alia: "The will of the electors with respect to baseball and football on Sunday may, after the year one thousand nine hundred and thirty-three, but not oftener than once in three years, be ascertained, and the question, as provided in this act, shall be submitted to the electors of any municipality upon demand, in writing, of petitioners equal to at least five per centum of the highest vote cast for any office in the municipality at the last preceding general or municipal election. . . . If a majority of the electors . . . are not in favor of such licensing, then the ordinance or resolution licensing such baseball and football games shall be repealed; but if a majority of the electors are in favor of such licensing, then an ordinance or resolution shall be enacted or adopted licensing baseball and football games to which an admission charge is made or is incidental."

a referendum in certain years is a legislative act. Appellants say in their brief: "Law-making power is delegated to petitioners by conferring upon them the sole power to command the submission of the question upon which the electors are empowered to express their will." The error of this proposition lies in the fact that the command for the submission of the question comes directly from the legislature. When 5% of the voters petition, as the legislature prescribes, for the referendum machinery to become operative, it automatically starts. The calling or demand of the voters for a referendum, as provided for in the above section, is no more a legislative act within the meaning of the constitutional provision against legislative acts by outside agencies than is the ordering of a municipal election by the corporate authorities of any county, city, town or incorporated district to ascertain the will of the voters as to an increase in indebtedness, as provided in the Acts of April 20, 1874, P. L. 65, and June 9, 1891, P. L. 252, and other acts cited in 53 Purdon Statutes, section 1874, page 342. The voting machine Act of April 18, 1929, P. L. 549, provides in section 3 for the placing by the county commissioners on the ballot the question: "Shall voting machines be used in the (county, city, borough, or township) of . . ." The act further provides that the county commissioners shall do this upon receiving a request from the council of any city or borough, or from the commissioners or supervisors of any township, said request being properly evidenced. The commissioners shall also do this upon the filing of a petition signed by qualified electors of the county, city, borough or township, equal in number to at least one per cent of the total number of votes cast at the preceding general or municipal election, but in no case less than fifty.

In Moers v. City of Reading, 21 Pa. 188, this court held that an act of assembly which provided that "in case the corporate authorities of the City of Reading

shall propose to subscribe to the stock of the Lebanon Valley R. R. Company, it shall be their duty to fix the time for holding the election hereby authorized, . . . and if a majority favor such subscription, the same shall be made," was not a delegation of legislative power to the citizens of Reading. Speaking for the court, Chief Justice Black said: "Half the statutes on our books are in the alternative, depending on the discretion of some person or persons to whom is confided the duty of determining whether the proper occasion exists for executing them. But it cannot be said that the exercise of such a discretion is the making of the law. New privileges, conferred on a public corporation, need not be absolute and peremptory, so as to force them on the members against their consent. When individuals or corporators are merely authorized to do a thing, the doing of it necessarily depends on their own will; and we can see no reason why the acceptance of a new power, tendered to a public corporation, may not be made to depend on the will of the people when it is expressed by themselves, as well as when it is spoken by the mouths of their officers and agents."

The act now under review was a complete law when it left the legislature and it declared in substance that playing baseball and football between the hours of 2 and 6 P. M. on Sundays was prohibited, except in those communities where the majority of the voters indicate in the manner provided by law that they "favored" such games during such hours. We find nowhere in this act any delegation of legislative power.

The other three bases for the attack on the constitutionality of this act require but little discussion. In the able opinion of President Judge Bailey of the court below, the contention that this act is local or special legislation is conclusively answered. He said: "The words 'local' or 'special' law as used in this section 7, of article III, with relation to the various subjects named in its 28 paragraphs, clearly mean laws designed to operate

within particular municipalities to the exclusion of others." He aptly quotes from the opinion of Mr. Justice DEAN in Perkins v. Phila., 156 Pa. 554, 27 A. 356, saying: "But it has been decided in case after case since the Constitution of 1874 went into effect, in positive unmistakable language, that if the act was intended to apply to but one particular city, county or township, and was not intended to and could never apply to any other, it was local and therefore unconstitutional." Blackenburg v. Black, 200 Pa. 629, 50 A. 198, is also cited by the court below. Judge BAILEY then pertinently says that "the act in question applies to every municipality in the Commonwealth and operates upon all of them. It is argued, however, that since, by the submission of the question of Sunday baseball and football to voters in the various municipalities, and from the result of this vote, that act which might be legal in one would be illegal in another, brings the statute within those constitutional inhibitions as being local. The courts of this State, however, have held otherwise. It was decided that a statute, general in form and covering every county in the State, cannot be deemed local on account of varying results arising from the exercise of local option: Com. v. Woodring, 289 Pa. 437 [137 A. 635]."

The court below also effectively disposed of the third basis for the attack on this act, to wit, that it violates section 6, of article III, of the Constitution, supra. The learned judge said: "This section can be successfully invoked against a law when it purports to extend or amend a previous statute. . . . Section 8 of our act [that is, the act in question] shows that the intention of the legislature was not only to amend or extend the provisions of the Act of 1794, but to repeal them in so far as they might prohibit baseball and football on Sunday. This constitutional provision has reference to express amendments only. The act in question is a new law, complete in itself. Its meaning is apparent on its face, and does not require the reënforcement of any other stat-

ute to give it effect. It is, therefore, not void as violative of this constitutional limitation: Searight's Est., 163 Pa. 210, 216 [29 A. 800]; Com. v. Bowman, 35 Pa. Superior Ct. 410, 414."

The fourth basis of the attack on this act is that it breaches section 3, of article III, of the Constitution because no notice is given in the title of the act that it amends section 1 of the Act of April 22, 1794, which prohibits worldly employment and business and unlawful games on Sunday. Appellants say: "The subject of the Act of 1933 is the same as that of 1794. The earlier act covered the entire subject of worldly employment and business upon Sunday while the later statute is confined to two objects or members of the class of objects of such employment and business. This being true, the express partial repeal of section 1 of the Act of 1794, the reënactment of the prohibition imposed by the Act of 1794 by the 1933 Act and its referendum provisions are and can be nothing other than express alterations and amendments of the 1794 Act." As the court below said: "It is sufficient answer to this contention to say that this law does not purport to be an amendment, but in its title* it fairly gives notice of its contents, and that is all that is necessary: Com. v. Puder, 261 Pa. 129 [104 A. 505]."

In Snyder Co., to use, v. Wagenseller, 262 Pa. 269, 105 A. 297, this court said as to the title of the act then in question: "The notice of the contents is sufficient to lead persons interested in the subject-matter to inquire

---

* The title of the act is as follows: "An act relating to baseball and football on Sunday; prohibiting baseball and football on Sunday during certain hours, and also during certain other hours unless the electors of a municipality are in favor of the same and, in certain case, a license has first been secured from the municipal authorities; providing for referendums to ascertain the will of the electors, and for the enactment and repeal of licensing ordinances and resolutions in accordance therewith; providing penalties; and repealing inconsistent laws."

into the body of the act to determine how, and under what conditions, the money shall be paid." This court has frequently said that "title to an act need not be an index to the contents." See Allegheny Co. Home's Case, 77 Pa. 77, and Graeff v. Schlottman et al., 287 Pa. 342, 135 A. 308.

In Leinbach's Est., 241 Pa. 32, 88 A. 67, this court said, in an opinion by Mr. Justice STEWART: "The purpose of the requirement [as to the sufficiency of title] was to reform a legislative practice which had theretofore prevailed of passing enactments under titles which, because of the generality of the words used therein, gave not even a hint of the subject legislated upon, and so far correct the practice that the title of the act thereafter should be so indicative of the subject of the act as to lead to inquiry and not mislead and entrap." See Com. v. Thomas, 248 Pa. 256, 93 A. 1019.

An examination of the title to the act challenged shows that it meets the test of sufficiency prescribed by section 3, article III, of the Constitution.

The decree is affirmed at appellants' cost.

