Bell Telephone Company of Pennsylvania *v.*
Driscoll et al., Appellants.

Argued May 27, 1941. Before MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*Paul D. Larimer,* with him *Harry M. Showalter* and *Claude T. Reno,* Attorney General, for appellants.

*Benjamin O. Frick,* with him *Arthur H. Hull,* for appellee.

OPINION BY MR. JUSTICE PARKER, September 29, 1941:

The Bell Telephone Company of Pennsylvania filed a bill in equity asking for an injunction restraining the defendants from enforcing against it Section 702 * of the Public Utility Law of 1937, as amended by Act of

---

*"No public utility, except a common carrier by railroad or motor vehicle subject to part one or part two of the Interstate Commerce Act, shall, without the prior approval of the commission, make effective or modify any contract with an affiliated interest, or, by way of donation, give to, or receive from, an affiliated interest, any property, money, security, right or thing: Provided, however, That the requirements of this section shall not apply to—(1) a contract for services as referred to in section seven hundred one of this act, or (2) any single or isolated transaction involving a cash consideration not ex-

September 28, 1938, P. L. 44 (66 PS §1272). The defendants moved to dismiss the bill for want of jurisdiction and the plaintiff secured a rule to show cause why a preliminary injunction should not be granted. The chancellor dismissed the preliminary objections to the bill and after hearing granted a preliminary injunction. Certain stipulations were filed with reference to the evidence taken, the bill was dismissed, and a decree nisi filed. The court in banc reversed the decree nisi and entered a final decree, in which the chancellor joined, granting the relief prayed for, and defendants have appealed. The decree must be affirmed.

The appellants renew their objection to the bill, insisting that where a statute requires commission approval of a contract between a public utility and an affiliated interest as a precedent to its validity, one who comes within the terms of the statute but who has failed to make the required application and against whom no attempt has been made to impose penalties cannot complain that the statute is unconstitutional. They suggest that the constitutionality of this section might be raised either by making contracts without prior approval from the commission and raising the constitutional question when penalties for the violation are attempted to be en-

ceeding one thousand dollars, or (3) any single or isolated transaction involving the purchase or sale of fixed assets, materials or supplies, used in rendering public service, in which the monetary value of the consideration does not exceed one per centum of the undepreciated book value of the fixed assets of such public utility, except that any such transaction, involving more than fifty thousand dollars, or involving any transfer of securities or loan of money, shall not be included in these exemptions, and shall be subject to the requirements of this section: And provided further, That, if the commission shall have granted its approval to any public utility to contract with an affiliated interest for the loan of sums of money at intervals, or for any continuing or serial transactions, the commission may, after hearing, and upon a finding of public interest, withdraw its approval thereof, and all portions of the contract made pursuant thereto, then executory, shall be void, and all transactions thereunder, other than payment by either party for value already received, shall be unlawful."

forced, or by complying with the section, and if at any time approval is refused, arguing the constitutionality of the act on appeal.

We have no doubt about the right of the Court of Common Pleas of Dauphin County in the exercise of its equitable powers to entertain a bill to enjoin an administrative agency of the Commonwealth from exercising powers not conferred on it or unconstitutionally conferred on it. That point has been decided too frequently to be longer in doubt: *Martin v. Baldy*, 249 Pa. 253, 259, 94 A. 1091; *Germantown Tr. Co. v. Powell*, 260 Pa. 181, 183, 103 A. 596; *York Rys. Co. v. Driscoll*, 331 Pa. 193, 196, 200 A. 864; *W. Pa. Hospital v. Lichliter*, 340 Pa. 382, 392, 17 A. 2d 206. The penalties imposed for failure to apply for approval are severe, a maximum of five years' imprisonment and $5,000 fine (66 PS §1495). It would be grossly unfair to require the corporation and its officers to risk such penalties in order to test the constitutionality of the act: *Ex Parte Young*, 209 U. S. 123, 28 S. Ct. 441, 449. It was there said: "When the penalties for disobedience are by fines so enormous and imprisonment so severe as to intimidate the company and its officers from resorting to the courts to test the validity of the legislation, the result is the same as if the law in terms prohibited the company from seeking judicial construction of laws which deeply affect its rights." To the same effect see *Pa. R. R. Co. v. Driscoll*, 330 Pa. 97, 101, 198 A. 130.

As to the alternative suggestion it is sufficient to say that the remedy is inadequate. The company was not under obligation to submit to the enforcement of an unconstitutional law. The chancellor found as a fact that appellee enters into more than thirty contracts a year for which it would be required to secure the approval of the commission. Much of its equipment must be obtained from an affiliate, the Western Electric Company, or otherwise it would be embarrassed in exercising its franchises and in furnishing service to the public with

resultant injury to it and the public. It was also found that compliance by plaintiff with §702 would subject it "to expense in each case in the preparation of and the hearings on such applications, and also subject plaintiff to the expense incurred by the Commission in the investigation of and hearings on such applications. . . . These expenses plaintiff would be unable to recover back. There might be delay in the commencement and completion of projects for which such contracts and orders were made or given, due to the necessity of preparation of and hearings on said applications and decision thereon. There would also be delay in the extension, replacement, or improvement of plaintiff's facilities for public service." When we consider that such hearings frequently cause delay of months and even years, it is clear that the company does not have an adequate or sufficient remedy.

It is the contention of the appellee, sustained by the court below, that §702 unlawfully delegates legislative powers to the commission and is therefore unconstitutional. As the conclusion of that court seems so clearly right, it will not be necessary to consider other objections to the section raised by the company. While we approach the subject with the presumption that the section is valid and constitutional, there are, nevertheless, constitutional limitations upon the power of the legislature to delegate its authority. This is firmly established by previous decisions of this court as well as by those of the Supreme Court of the United States. The constitution of this Commonwealth, in Articles II, §1, provides: "The legislative power of this Commonwealth shall be vested in a General Assembly which shall consist of a Senate and a House of Representatives." In *Boro. of W. Phila.*, 5 W. & S. 281, 283, we said: "Under a well-balanced constitution, the legislature can no more delegate its proper function than can the judiciary." The limits upon the power to delegate authority are set forth in the leading case of *Locke's Appeal*, 72 Pa. 491, 498:

"The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend, which cannot be known to the law-making power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation." Where the legislature establishes primary standards and then delegates to an administrative body the power to determine some fact or state of things upon which it makes or intends to make its own action depend, it is the legislature which has legislated and not the administrative body. The same thought was expressed by Chief Justice HUGHES in *Panama Refining Co. v. Ryan,* 293 U. S. 388, 426, 55 S. Ct. 241, 251, where speaking for the court he said: "Moreover the Congress may not only give such authorizations to determine specific facts, but may establish primary standards, devolving upon others the duty to carry out the declared legislative policy; that is, as Chief Justice MARSHALL expressed it, 'to fill up the details' under the general provisions made by the Legislature." Again, in *Interstate Commerce Com. v. Goodrich Transit Co.,* 224 U. S. 194, 214, 32 S. Ct. 436, 441, the principle is thus stated: "The Congress may not delegate its purely legislative power to a commission, but, having laid down the general rules of action under which a commission shall proceed, it may require of that commission the application of such rules to particular situations and the investigation of facts, with a view to making orders in a particular matter within the rules laid down by the Congress."

We are here concerned with that portion of §702 which requires the prior approval of the commission before the utility may make effective or modify any contract with an affiliated interest and our first inquiry is whether the company is affected by the alleged uncon-

stitutional features of the section. The elementary facts found by the court or shown by the pleadings demonstrate that it is. The operating territory of the Bell Telephone Company of Pennsylvania is confined to Pennsylvania but it is surrounded by territory of other Bell companies owned or controlled by the American Telephone and Telegraph Company, so that each has an affiliated interest with the others within the meaning of the Public Utility Law. By reason of the long distance telephone service rendered there is necessarily a close working interest among the affiliates. The lines are not only connected but the method of conducting intercommunications makes necessary the use in common of poles, ducts and other spaces with the result that there are many contractual dealings in varied forms. The appellee has no purchasing department of its own, no warehouses, no organization for disposing of equipment which is junked, no engineering force for installing central office equipment. All this service is performed by an affiliate, the Western Electric Company. It must make many contracts with that company that come within the terms of the section and it is frequently necessary to modify such contracts.

The Western Electric Company manufactures about 23,000 items which are used by this utility and less than 3,000 of them can be obtained elsewhere. It would greatly increase the cost of equipment to the appellee if it were deprived of this source of purchase. The delays incident to applications and hearings would seriously affect the service rendered by the company and entail much engineering and legal expense.

There is no explicit standard set up in this section to guide the commission and we do not understand that the appellants contend that there is. They seek to find such guide by reference to the whole act. The appellants' argument becomes somewhat hard to follow at this point for they do not make clear whether the alleged implicit standard is merely public interest or something more

definite. The form of this section would seem to indicate that the legislature did not intend to set up any standard for the commission in approving contracts, for its power to approve or disapprove is untrammeled by any conditions while the right of the commission to withdraw its approval previously given is conditioned on a finding of public interest.

Even if we were to consider that public interest can be implied as the standard for approval, that term would not be a proper standard unless further defined or limited in its meaning. To hold otherwise would be to reject the rule that the legislature may not delegate its authority to legislate since in any such delegation there is an implication that the power will be exercised in the public interest. Before any commission can decide whether a contract is contrary to public interest, it is necessary to find what is or what is not in the public interest. The power to make such determination rests with the legislature and without such declaration the commission would be without a standard or criterion. The phrase "public interest" as used in this connection is "a concept without ascertainable criterion." At best the term is too vague and elastic to furnish a standard. As we have said: "In all such occasions, nevertheless, the legislative body must surround such authority with definite standards, policies and limitations to which such administrative officers, boards or commissions, must strictly adhere and by which they are strictly governed. . . . If the legislature fails, however, to prescribe with reasonable clarity the limits of the power delegated or if those limits are too broad its attempt to delegate is a nullity: *Schechter Poultry Corp. v. United States,* 295 U. S. 495; *Panama Refining Co. v. Ryan,* supra; *O'Neil v. Insurance Co.,* 166 Pa. 72": *Holgate Bros. Co. v. Bashore,* 331 Pa. 255, 260, 263, 200 A. 672.

There are undoubtedly situations where the courts have been able to gather a definite and clear standard or criterion for the guidance of commissions and similar

bodies by resort to an entire act and the context. Such were the situations in *Texas v. U. S.*, 292 U. S. 522, 54 S. Ct. 819; *New York Central Securities Co. v. U. S.*, 287 U. S. 12, 53 S. Ct. 45; *Federal Radio Com. v. Nelson Bros. Co.*, 289 U. S. 266, 53 S. Ct. 627. But here we find little support for the appellants' position. It is not strange that the appellants failed to point to any specific provision that would support this contention. Their argument continually comes back to public interest as a criterion. However, they have referred to decisions *(Solar Electric Co. v. P. U. C.*, 137 Pa. Superior Ct. 325, 333, 9 A. 2d 447; *Johnsonburg v. P. S. C.*, 98 Pa. Superior Ct. 284, 291; *Chambersburg Gas Co. v. P. S. C.*, 116 Pa. Superior Ct. 196, 226, 176 A. 794) where the appellate courts have emphasized the necessity to scrutinize with care dealings between affiliates where rate cases are involved and suggest that the standard to guide the commission in the exercise of power under §702 is to be based on a finding of public interest as affecting rates and adequacy of service.

It is conceded that the legislature may forbid contracts between affiliates which are inimical to the public interest and that the legislature may establish primary standards which such contracts must meet and then delegate to the commission the power to determine the facts which place such contracts within or outside the legislative prohibition. The objection to the course followed here is that the commission is not restrained in any respect by a standard or norm. It is the prerogative of the legislature and not of the commission to determine what the public policy shall be. When this has been done the commission may then determine whether a state of facts shows a compliance with that predetermined policy.

The act as a whole covers many sorts of utilities and a multiplicity of subjects that naturally arise in serving the public, but when we examine it with the purpose in view of finding whether there is any standard that may be employed in interpreting §702, we find only a general

purpose to regulate rates and to assure adequate service without discrimination. The relation of §702 to rates is exceedingly tenuous for it is specifically provided by §705 (66 PS §1275) that approvals granted to a public utility by the commission with respect to any contract with an affiliated interest shall not bind or require the commission in fixing rates to take into consideration any payment made under any contract so approved. The rela- tion to adequate service is even more remote. Every con- tract of a utility may affect adequate service but this sec- tion deals only with a limited type of contract. Notwith- standing any slight connection which might be found between contracts with affiliates and rates and service, we still have no standard furnished on which the com- mission is to base its action. If the utility should make an application and a hearing be required, there is not the slightest indication of what proofs the utility should fur- nish in order to secure approval. Section 702 leaves the commission in absolute control without restraint in its approval or disapproval of such contracts.

It is well settled that the commission is not the finan- cial manager of the corporation: *Chambersburg Gas Co. v. P. S. C.*, supra (p. 227) ; *Springfield v. Springfield Gas & Elec. Corp.*, 291 Ill. 209, 234; *Houston v. Southwestern Bell Tel. Co.*, 259 U. S. 318, 323, 42 S. Ct. 486. "The Pub- lic Utility Commission is not a super board of directors for the public utility companies of the State and it has no right of management of them. Its sole power is to see that in the matter of rates, service and facilities, their treatment of the public is fair": *Northern Penna. Power Co. v. P. U. C.*, 333 Pa. 265, 267, 5 A. 2d 133. This section is not limited to regulation. It has gone much farther. It is not an attempt to prescribe what the utility shall do or not do, but is rather an attempt to delegate to a com- mission a power to manage the business of the corpora- tion as fully as the board of directors of the utility might do, as to an important and essential function. If this could be done, then the commission would determine the

economic and fiscal policy of the utility. The grant of such unusual powers constitutes an illegal and unconstitutional delegation of authority.

The decree of the court below is affirmed at the costs of the defendants, but the plaintiff shall bear the expense of printing its own briefs.