**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., EAKIN, BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.**

| | | |
|---|---|---|
| WEST PHILADELPHIA ACHIEVEMENT CHARTER ELEMENTARY SCHOOL, | : | No. 31 EM 2014 |
| | : | |
| Petitioner | : | |
| | : | |
| | : | ARGUED: September 9, 2014 |
| v. | : | RE-SUBMITTED: January 20, 2016 |
| | : | |
| THE SCHOOL DISTRICT OF PHILADELPHIA AND SCHOOL REFORM COMMISSION, | : | |
| | : | |
| | : | |
| Respondents | : | |

*OPINION*

**MR. CHIEF JUSTICE SAYLOR**          **DECIDED: February 16, 2016**

In this matter we address whether legislation designed to help the Philadelphia School District recover from financial hardship violates the non-delegation rule.

Public schools in Pennsylvania are governed by the Public School Code of 1949.[1] In 1959, Article VI(F) was added to the code to assist school districts experiencing financial distress. *See* 24 P.S. §§6-691 to 6-695 (1959) (the "Distress Law").[2] Responding to adverse financial conditions in the Philadelphia School District

---

[1] Act of Mar. 10, 1949, P.L. 30 (as amended 24 P.S. §§1-101 to 27-2702) (the "School Code").

[2] In particular, a new Article VI(F) was added with the original Article VI(F), pertaining to an unrelated topic, remaining in place. It is unknown why the Legislature duplicated the article and section numbers. Such designations as used here pertain to the second Article VI(F) appearing in the School Code, *i.e.*, the Distress Law.

(the "School District"), the Legislature again amended the School Code in the late 1990s by adding provisions to the Distress Law tailored to school districts of the first class, *i.e.*, the School District. *See* Act of Apr. 27, 1998, P.L. 270, No. 46 ("Act 46"). Act 46 augmented Section 691 of the School Code so that the Secretary of Education could declare the School District distressed if it failed certain budgetary requirements or would fail to provide an educational program in compliance with the School Code, the State Board of Education's regulations, or the Secretary's standards. *See* 24 P.S. §6-691(c). Act 46 also added Section 696 to the Distress Law, which provided that when the School District was declared distressed under Section 691(c), the Secretary was to appoint a chief executive officer ("CEO") to oversee it. *See id.* §6-696 (1998). The CEO was given the power to suspend or revoke charters and, notably for present purposes, to suspend regulations of the State Board of Education and "the requirements of this act," *i.e.*, the School Code. *Id.* §6-696(i)(3) (1998).

In October 2001, Section 696 was again amended. These revisions provide that on a declaration of distress, a five-member School Reform Commission ("SRC") – mostly appointed by the Governor – is to be named to oversee the School District, thus assuming various powers formerly assigned to the CEO. The amendments give the SRC, which is an instrumentality of the school district exercising the school board's authority, sweeping powers, including "all powers granted to the superintendent by law and a special board of control under section 693[.]" 24 P.S. §6-696(i). Of central relevance here, they also transfer to the SRC the suspension powers previously given to the CEO.

During the 2001-2002 school year, the School District experienced a substantial budgetary shortfall. In December 2001, the Secretary declared the district to be distressed per Section 691(c). The Philadelphia School Board's powers were

suspended and the present SRC was appointed and assumed governance of the district.

Meanwhile, Petitioner, the West Philadelphia Achievement Charter Elementary School (the "Charter School") had applied for a charter. In 2001, the School District granted it a five-year charter which the SRC renewed for an additional five years in 2006. As the charter's expiration approached in 2011, the Charter School again sought renewal. The SRC responded by passing Resolution 20 of 2011 ("SRC-2011-20").

SRC-2011-20 specified that the Charter School's charter was renewable for an additional five years subject to certain conditions. It also provided that, "the SRC, pursuant to section 6-696(i)(3) of the Public School Code, partially suspends the corrective action status provision in Section 17-1729-A(a.1) of the Charter School Law . . .." SRC-2011-20 at 2.[3] Section 17-1729-A(a.1), the suspended provision, states that when a charter school located in a first class school district is in corrective action status – meaning it has failed to meet adequate yearly progress for at least four consecutive years, *see* 24 P.S. §1-102 – and seeks to renew its charter, the school district's governing body may place reasonable conditions in the charter that require the school to meet student performance targets within stated time periods. *See* 24 P.S. §17-1729-A(a.1). However, the Charter School was not in corrective action status. Thus, the SRC's suspension of Section 17-1729-A(a.1) had the effect of removing the requirement that a charter school be in corrective action status prior to the SRC placing conditions in a renewed charter. SRC-2011-20 also set forth other requirements for the renewal of the charter, including that the Charter School must agree to enroll no more than 400 students notwithstanding that, under the Charter School Law, charter schools

---

[3] The Charter School Law is part of the School Code and is set forth at 24 P.S. §§17-1701-A to 17-1751-A.

are not subject to school-district-imposed enrollment caps. *See* 24 P.S. §17-1723-A(d)(1) (providing that a school district's governing authority may not impose an enrollment cap on a charter school absent the charter school's consent).

The Charter School refused to sign a charter renewal agreement containing the terms of SRC-2011-20. Although the 2006 charter expired in 2011, the Charter School continued to operate. Additionally, its enrollment exceeded 400 students. The School District began reimbursing the Charter School for only 400 students. Thereafter, the Charter School requested, and ultimately received, funding for the additional students from the Department of Education pursuant to Section 1725-A(a)(5) of the Charter School law. That provision requires a school district to pay a charter school for each enrolled student; it also states that, in the event the district fails to make such payment, the Secretary must deduct the deficiency from Commonwealth payments that would otherwise be made to the district. *See* 24 P.S. §17-1725-A(a)(5). The consequence is that, for the Charter School's enrollment in excess of 400 students, some monies that the Department would have paid over to the School District were instead provided to the Charter School.

The School District's financial condition continued to decline between 2011 and 2013. The SRC reduced expenditures and made staff reductions. However, these retrenchments were insufficient to keep pace with revenue shortfalls. Thus, the SRC passed Resolution 1 of 2013 ("SRC-2013-1"), stating that the School District was in the midst of an untenable financial crisis. SRC-2013-1 suspended a number of sections of the Charter School Law, as well as "any applicable regulations," on the grounds that the SRC "desire[d] to remove limitations on its power to suspend charters[.]" SRC-2013-1 at 4. One category of suspended provisions concerned the nonrenewal or revocation of charters, in particular: Section 17-1729-A(a), which provides the causes and grounds

for nonrenewal or revocation; Section 17-1729-A(c), which requires that a public hearing be held regarding any decision to revoke or not renew a charter; Section 17-1729-A(d), which establishes a procedure for charter schools to appeal a school district's revocation or nonrenewal determination to the State Charter School Appeal Board; and Section 17-1729-A(f), which clarifies that, while an administrative appeal is ongoing, the school's charter remains in effect. The resolution indicated that these additional suspensions "shall not be effective until a policy containing a set of standards and procedures is adopted by the [SRC]." *Id.* at 5.

SRC-2013-1 also expanded the SRC's authority to impose student performance targets on charter schools. As noted, Section 17-1729-A(a.1) permits the imposition of student performance targets only when the charter school is in corrective action status. SRC-2013-1 stated that the SRC "needs more flexibility in declining to renew a poor-performing charter school and desires to require all charter schools to meet specific reasonable student performance targets[.]" SRC-2013-1 at 6. Accordingly, this portion of SRC-2013-1 abrogated Section 17-1729-A(a.1)'s limitation that only schools in corrective action status may be subject to performance targets as a condition of charter renewal. *See id.*[4]

Next, SRC-2013-1 observed that the School Code does not permit limits on charter school enrollment unless the charter school agrees to such limits. *See* SRC-2013-1 at 6 (citing 24 P.S. §17-1723-A(d)). Accordingly, SRC-2013-1 suspended those provisions, permitting the SRC to place enrollment caps unilaterally on any charter school. Finally, SRC-2013-1 eliminated the ability of charter schools to receive funding for enrolled students directly from the Department of Education. To achieve this, SRC-

---

[4] This aspect of SRC-2013-1 appears duplicative of a portion of SRC-2011-20 discussed above. It may have been intended to accomplish more explicitly what SRC-2011-20 achieved indirectly.

2013-1 suspended Section 17-1725-A(a)(5) and all associated regulations. *See* SRC-2013-1 at 7.

In February 2014, the SRC released a draft version of its "Proposed Charter Schools Policy," apparently to implement SRC-2013-1's provisions, some of which, as noted, were subject to the adoption of standards and procedures. The Charter Schools Policy states, *inter alia*, that charter schools must accept enrollment caps imposed by the SRC. It also provides that, in the absence of an agreement between a charter school and the SRC, the SRC may dictate the terms under which the charter school operates. As well, the Charter Schools Policy sets forth new reasons to revoke or non-renew a charter that do not appear in the School Code, including that a charter school failed to comply with SRC-imposed enrollment caps.

Shortly after the release of the Proposed Charter Schools Policy, the Charter School filed in this Court a pleading styled as an Application for Leave to File Petition in the Nature of a Complaint for Declaratory Judgment and Injunctive Relief Pursuant to Pa.R.A.P. 3307 (the "Application"). The Application, which named the School District and the SRC as respondents, was directed to this Court's original jurisdiction pursuant to Section 27 of Act 46, which states:

> The Pennsylvania Supreme Court shall have exclusive jurisdiction to hear any challenge to or to render a declaratory judgment concerning the constitutionality of sections 691(c) and 696 of the act . . .. The Supreme Court is authorized to take such action as it deems appropriate, consistent with the Supreme Court retaining jurisdiction over such a matter, to find facts or to expedite a final judgment in connection with such a challenge or request for declaratory relief.

Act 46, §27, *reprinted in* 24 P.S. §6-691, Historical & Statutory Notes. The Charter School also filed an accompanying Petition in the Nature of a Complaint for Declaratory Judgment and Injunctive Relief, followed by a first amended petition (the "Complaint").

In the Complaint, the Charter School challenged the constitutionality of Section 696(i)(3), arguing that it "gives the SRC unlimited discretion and power to suspend provisions of the School Code without establishing standards or restraints on the use of that power." Complaint at 25. The Charter School asserted that this power is in violation of the non-delegation precept of Article II, Section 1 of the state Constitution. The school maintained that, while the Legislature may delegate authority to execute or administer laws, it must establish standards and limit such delegation so that the administrative agency tasked with executing the laws conducts itself in compliance with legislative purposes. *See id.* at 26 (citing, *inter alia*, *Pennsylvanians Against Gambling Expansion Fund v. Commonwealth*, 583 Pa. 275, 331, 877 A.2d 383, 417 (2005) ("PAGE"), and *Blackwell v. State Ethics Comm'n*, 523 Pa. 347, 359, 567 A.2d 630, 636 (1989)). Thus, the Charter School expressed that a delegation of legislative authority is constitutional only if the General Assembly sets forth the policies guiding the delegation and surrounds it with definite standards and limitations. *See id.* at 27 (quoting *Bell Tel. v. Driscoll*, 343 Pa. 109, 116, 21 A.2d 912, 915-16 (1941)). According to the Charter School, Section 696(i)(3) of the Distress Law lacks the limitations and standards necessary to render it a constitutionally-permissible delegation of legislative authority. *See id.*[5]

The Charter School asked this Court to issue a declaratory judgment specifying that Section 696(i)(3) of the Distress Law, 24 P.S. §6-696(i)(3), is unconstitutional as an unlawful delegation of the General Assembly's legislative authority in violation of Article II, Section 1. It also requested preliminary and permanent injunctive relief.

---

[5] The Charter School raised additional constitutional and statutory claims. In view of our disposition below, we need not discuss them.

The SRC and School District (collectively, "Respondents") filed an answer primarily asserting that some of the Charter School's claims were not of constitutional dimension and, as such, they were outside the scope of this Court's obligation to exercise jurisdiction under Section 27 of Act 46. Respondents did acknowledge, however, that this Court had jurisdiction over the non-delegation claim. *See* Response to Application for Leave to File Petition at 22-23.[6]

Upon review, we granted the Application and issued a preliminary injunction limited to a directive that the parties preserve the status quo as it existed when the Application was filed. We also reserved judgment as to declaratory and permanent injunctive relief and directed the parties to brief, *inter alia*, the non-delegation issue.

The Charter School largely renews the contentions it advanced in its Complaint. It suggests that Section 696(i)(3) grants unfettered power to the SRC to suspend virtually any subset of the School Code's many provisions without any standards to guide or restrain the use of that power. It claims that the SRC has now used such power to suspend laws that granted specific rights to charter schools, and it has substituted its own "Charter School Policy" in place of the suspended provisions. Put simply, the Charter School argues that, with respect to charter schools, the SRC has created its own law, which is contrary to Article II, Section 1.

The Pennsylvania Coalition of Public Charter Schools and Philadelphia's Mathematics, Science and Technology Community Charter School ("MaST") have submitted a joint *amicus* brief supporting the Charter School's request for relief. *Amici* suggest that Respondents' actions have jeopardized the interests and operations of

---

[6] The Attorney General was served with a copy of the Complaint as it advanced a constitutional challenge to a statute. *See* Pa.R.A.P. 521. She indicated, however, that the Department of Education would respond in her stead. The Department ultimately chose to file an *amicus* brief in lieu of a responsive pleading.

Philadelphia's charter school communities, which include parents and students. *Amici* also assert that such actions are contrary to the interests of the larger community, including the scholastic interests of the 5,300 students on MaST's waiting list.

Respondents observe, first, that legislative authority is the power to make, alter, and repeal laws. *See* Brief for Respondents at 23-24 (quoting *Jubelirer v. Rendell*, 598 Pa. 16, 41, 953 A.2d 514, 529 (2008)). They state that suspensions do not equate to the making, amendment, or repeal of any law, and hence, the non-delegation doctrine does not apply to the SRC's suspension powers under Section 696(i)(3). Respondents contend that the governing constitutional provision in this case is Article I, Section 12, which, by its terms, permits the Legislature to delegate the power to suspend laws. *See* PA. CONST. art. I, §12 ("No power of suspending laws shall be exercised unless by the Legislature *or by its authority*." (emphasis added)). Further, according to Respondents, even if the non-delegation doctrine does apply, Section 696(i)(3) does not violate it. In this regard, Respondents proffer that the doctrine requires only that the governing statute as a whole make clear the Legislature's policy choices so that those on whom the Legislature confers power act in accordance with those choices. As applied here, Respondents argue, the Distress Law clarifies that its overall policy objective is to take all measures necessary to rescue a school district of the first class from financial distress, and that this policy provides a governing standard for the SRC's exercise of its suspension authority. *See* Brief for Respondents at 32-33 ("The policy of the [Distress Law] is clear – end the distress.").

The Department of Education and the Acting Secretary of Education, as *amici* supporting Respondents, add that the School District is in a statutorily defined state of fiscal distress as demonstrated by the Secretary's issuance of a declaration of distress under Section 691. They maintain that the Legislature intended, under such

circumstances, for the SRC to retain powers necessary to reverse the prevailing conditions of financial hardship and poor academic performance. *Amici* reason that such conditions, as defined by Section 691 of the School Code, and as further clarified by the Secretary's declaration of distress, provide adequate guidance to the SRC, thereby rendering its Section 696(i)(3) suspension powers constitutional.

Article II, Section 1 of the Pennsylvania Constitution states that "[t]he legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives." PA. CONST. art. II, §1.[7] The non-delegation rule has been described as a "natural corollary" to this text. *Chartiers Valley Joint Schs. v. Allegheny Cnty. Bd. of Sch. Dirs.*, 418 Pa. 520, 529, 211 A.2d 487, 492 (1965); *see also W. Mifflin Area Sch. Dist. v. Zahorchak*, 607 Pa. 153, 158 n.5, 4 A.3d 1042, 1045 n.5 (2010) (noting that Section 1 "has been interpreted to . . . require[] that the basic policy choices involved in legislative power actually be made by the Legislature" (internal quotation marks and citation omitted)). The precept, which has its origins in the separation-of-powers doctrine, *see Lehman v. Pa. State Police,* 576 Pa. 365, 380, 839 A.2d 265, 274 (2003), is of early lineage, *see Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825) (Marshall, C.J.), and was expressed by political theorists who influenced the framers of the Constitution. *See, e.g.,* JOHN LOCKE, SECOND TREATISE OF GOVERNMENT §141 (1690) (observing that legislative power "consists of the power to make laws, not to make legislators," and indicating, moreover, that the legislature is not free to transfer its lawmaking powers to any other body because such power was delegated to the legislature by the people); *cf.* 1 WILLIAM BLACKSTONE,

---

[7] The federal analog is reposed in Article I, Section 1 of the United States Constitution. *See* U.S. CONST. art. I, §1 ("All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.").

COMMENTARIES ON THE LAWS OF ENGLAND *168 (1753) (remarking that a member of the House of Commons could not delegate his vote to a proxy "as he himself is but a proxy for a multitude of other people"). *See generally* BARON DE MONTESQUIEU, THE SPIRIT OF THE LAWS XI:6 (1748) (suggesting that political liberty requires a separation of legislative, executive, and judicial powers), *quoted in* THE FEDERALIST NO. 47 (James Madison).

This Court has considered multiple categories of non-delegation challenges. One such category involves statutes in which the General Assembly enacts a law but leaves its effectiveness to be determined by another person or entity via the ascertainment of some material fact or state of affairs. For example, in *Locke's Appeal*, 72 Pa. (22 Smith) 491 (1873), the Court approved a local-option law by which the electors of a municipality could vote to either allow or prohibit the sale of alcohol within the district. *See id.* at 494-95. The Court explained that the Legislature passed the law, which included such provisions as penalties for violating any ban on the sale of alcohol, but left its effectiveness to be determined by ascertainment of a fact, namely, the majority vote of the district's electors. *See id.* at 498; *accord Driscoll*, 343 Pa. at 114, 21 A.2d at 914-15 ("Where the legislature . . . delegates to an administrative body the power to determine some fact or state of things upon which it makes or intends to make its own action depend, it is the legislature which has legislated and not the administrative body."). Thus, *Locke's Appeal* upheld the challenged statute. *See also Young v. Fetterolf*, 320 Pa. 289, 182 A. 676 (1936) (approving a statute giving municipalities the option to suspend a law prohibiting certain sporting events).

Another category of cases in which delegation has been challenged involves the legislative establishment of primary objectives or standards and the entrustment to another entity to "fill up the details under the general [legislative] provisions[.]" *Driscoll*,

343 Pa. at 114, 21 A.2d at 915 (internal quotation marks and citation omitted); *cf. Panama Refining Co. v. Ryan*, 293 U.S. 388, 426, 55 S. Ct. 241, 251 (1935) ("Congress may . . . establish primary standards, devolving upon others the duty to carry out the declared legislative policy[.]"); *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409, 48 S. Ct. 348, 352 (1928) (Taft, C.J.) (requiring an "intelligible principle" to which the non-legislative body must conform), *quoted in Holgate Bros. Co. v. Bashore*, 331 Pa. 255, 262, 200 A. 672, 675 (1938). So long as adequately-defined standards and methodologies are provided by the Legislature, the administrative action involved may be as narrow as the grant or denial of a license, *see, e.g.*, *Casino Free Phila. v. Pa. Gaming Control Bd.*, 594 Pa. 202, 934 A.2d 1249 (2007), or as broad as the setting and adjustment of minimum and maximum wholesale and retail prices of a commodity to ensure fairness to producers and consumers and to regulate the supply of that commodity. *See, e.g.*, *Rohrer v. Milk Control Bd.*, 322 Pa. 257, 186 A. 336 (1936) (adopting the Superior Court dissent as this Court's opinion).

The enactment under review contains aspects of both of these classifications. It assigns to an executive branch official the duty to ascertain facts preliminary to a determination that a school district of the first class is in distress. *See* 24 P.S. §6-691(c). That part of the law is uncontroversial. The contested issue is whether the Legislature provided adequate standards to channel the SRC's discretion in choosing which portions of the School Code to suspend pursuant to Section 696(i)(3) in order to remediate such distress.

Initially, we agree with Respondents that via the Distress Law, as amended in 1998 and 2001, the Legislature sought to empower the SRC to take actions which it might deem necessary or convenient to alleviate the School District's ongoing financial crisis. While this is a salutary goal, the means chosen to effectuate it were extremely

broad: the Legislature gave the SRC what amounts to *carte blanche* powers to suspend virtually any combination of provisions of the School Code – a statute covering a broad range of topics. *See* 24 P.S. §6-696(i)(3) (authorizing the SRC generally to "suspend the requirements of" the School Code and its associated departmental regulations).[8] This Court's decisions addressing the non-delegation rule have never deemed such an unconstrained grant of authority to be constitutionally valid. To the extent Respondents couch the legislative intention to remediate the School District's financial distress as a standard, moreover, we find this to be more aptly described as the legislative *objective*. Indeed, neither Section 696(i)(3) nor the Distress Law generally imposes any discernable standards or restraints in relation to the selection of School Code provisions for suspension. Those high-level determinations are left entirely to the SRC's discretion, and it is not apparent that any mechanism exists to either channel or test the SRC's exercise of such discretion.

The SRC's actions in the present case demonstrate the point: the SRC suspended a number of significant aspects of the Charter School Law and, in effect, rewrote some of that law in the form of its Charter Schools Policy. One aspect of the Charter School Law that the SRC suspended sets forth the bases for nonrenewal or termination of a charter and allows a charter school which suffers an adverse decision to obtain a hearing and administrative review before the State Charter School Appeal Board. *See* SRC-2013-1 at 4-5; 24 P.S. §17-1729-A(a), (d), *quoted in* Complaint at 10-

---

[8] The acuteness of the District's financial situation cannot serve as a basis to liberalize the non-delegation precept. *See Holgate Bros.*, 331 Pa. at 260, 200 A. at 675 ("Regardless of exigencies which at times arise or of how trying our economic or social conditions become, the powers and duties imposed by the Constitution upon the legislative branch . . . remain steadfast and neither the urgency of the necessity at hand nor the gravity of the situation allow the legislature to abdicate, transfer or delegate its authority or duty to another branch of the government.").

12. *See generally* 24 P.S. §17-1721-A (establishing the state appeal board). This suspension undermines the concept that the SRC's decision making is, realistically, subject to standards set forth by the Legislature. Furthermore, that the Charter Schools Policy is essentially a legislative document is illustrated by, *inter alia*, its addition of eight new criteria for nonrenewal or revocation of a charter above and beyond those decided on by the Legislature in Section 1729-A of the Charter School Law. *See* Charter Schools Policy at 17.

The Distress Law also lacks any mechanism to limit the SRC's actions so as to "protect[] against administrative arbitrariness and caprice." *Tosto v. Pa. Nursing Home Loan Agency*, 460 Pa. 1, 12, 331 A.2d 198, 203 (1975). *See generally William Penn Parking Garage, Inc. v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269 (1975) (plurality) (reciting that the non-delegation rule serves two interrelated purposes: to ensure the Legislature makes basic policy choices, and to protect against the arbitrary exercise of unnecessary and uncontrolled discretionary power). This is a substantial deficiency because this Court has generally viewed the inclusion of such limitations as a necessary condition to satisfy the non-delegation rule. *See Holgate Bros.*, 331 Pa. at 260, 200 A. at 675 ("In all such occasions . . . the legislative body must surround such authority with definite standards, policies and limitations to which such administrative officers, boards or commissions, must strictly adhere and by which they are strictly governed.").

In *Tosto*, for example, the Court considered a non-delegation challenge to the Nursing Home Loan Agency Law – a statute designed to provide financing for nursing home capital improvements undertaken to accommodate the health and safety needs of a nursing home's residents. *Tosto* rejected the constitutional attack because the law provided "detailed guidelines for certain important agency decisions," as well as

"numerous procedural guidelines for protection against administrative arbitrariness[.]" *Tosto*, 460 Pa. at 12-13, 331 A.2d at 203. These requirements included a legislative mandate that the agency establish neutral criteria for use in determining priority among applicants and develop standardized forms for loan applications. *See id.* The Court concluded that the use of such "criteria and forms is an important safeguard against the arbitrariness of ad hoc decision making." *Id.* at 13, 331 A.2d at 204.

Several months later, the Court announced its decision in *William Penn*. That dispute involved a tax enabling statute which, among other things, permitted courts to assess whether certain local taxes were "excessive and unreasonable," and thus, invalid. The plurality observed that the enabling law afforded substantial protections against uncontrolled discretionary power. It noted, in this respect, that the evaluation of tax excessiveness or reasonableness was assigned to the judicial branch which must explain the grounds for its decision in a reasoned opinion subject to appellate review, so as "to insure the general consistency of [the courts'] actions . . . and to confine them within their proper sphere." *William Penn*, 464 Pa. at 213, 346 A.2d at 291-92. Thus, the delegation was held to be appropriate.

On the other hand, in *PAGE* the Court faced a non-delegation challenge to Section 1506 of the Pennsylvania Race Horse Development and Gaming Act (the "Gaming Act"), which indicated that the siting of a slot-machine facility could not be prohibited by zoning laws, but that the Gaming Control Board could, in its discretion, "consider such local zoning ordinances when considering an application for a slot machine license." *PAGE,* 583 Pa. at 329, 877 A.2d at 416 (quoting 4 Pa.C.S. §1506 (repealed and replaced)). In evaluating whether the statute complied with Article II, Section 1, the Court reviewed a number of non-delegation decisions – including *Tosto* and *William Penn* – and recognized that, not only must the Legislature make the "basic

policy choices" embodied in a law, it must also supply "adequate standards which will *guide and restrain* the exercise of the delegated administrative functions." *Id.* at 333, 877 A.2d at 418 (emphasis added) (internal quotation marks and citation omitted). With this litmus, *PAGE* concluded that Section 1506 of the Gaming Act stood in contrast to the provisions upheld in prior cases because it did not supply the Gaming Control Board with "definite standards, policies and limitations to guide its decision-making with regard to zoning issues." *Id.* at 334, 877 A.2d at 418; *cf. State Bd. of Chiropractic Exam'rs v. Life Fellowship of Pa.*, 441 Pa. 293, 298, 272 A.2d 478, 481 (1971) (invalidating a law which effectively delegated to the Pennsylvania Chiropractic Society the task of determining the requirements, quality, and nature of chiropractic continuing education).

Although the present case may not be on all fours with *PAGE* – since the legislative goal here is evident, whereas the Gaming Act gave no indication regarding what, if any, importance the Gaming Control Board should give to local zoning laws – it is more like *PAGE* than *Tosto* or *William Penn*. As explained, there are few, if any, concrete measures embodied in the Distress Law to effectively channel the SRC's discretion as in *Tosto*, and there is no requirement that the SRC hold hearings or explain the grounds for its suspension decisions in a reasoned opinion subject to judicial review as a check against arbitrariness or *ad hoc* decision making, as in *William Penn*. The SRC's awareness of the objective of its mission does not equate to definite standards, enforceable guidelines, or a realistic check against arbitrary decision making. *See Panama Refining*, 293 U.S. at 431-32, 55 S. Ct. at 253 (explaining that, unless a statute requires the person with delegated powers to make particularized findings that certain prerequisites are met, any standards or guidelines derived solely from stated legislative policy objectives are "inoperative" to exert any control over that person).

Additionally, the Distress Law does not merely empower the SRC to grant or deny charters. It permits the SRC to govern many substantive aspects of the delivery of public education in Philadelphia – including the operation of charter schools – through the suspension of virtually any combination of School Code provisions and associated regulations. In this regard, Petitioner argues, persuasively in our view, that:

> The power to suspend the requirements of the Public School Code is an extremely broad power and is especially broad in the context of this case. The Public School Code is a significant body of law that is subdivided into more than 60 articles and hundreds of statutes, with far-reaching effects on the creation, operation, finances, and legal rights of students, teachers, and taxpayers. The Code concerns widely divergent topics such as public bidding requirements, school construction, reimbursements between the Commonwealth and school districts, [and] rules for the auditing of school finances . . .. Pursuant to the statutes that make up the various parts of the Code, the State Board of Education has promulgated a vast set of regulations embodied in Title 22 of the Pennsylvania Code, which itself outlines an extremely complex regulatory scheme governing the manner in which public education is delivered in Pennsylvania. . . .

> [T]he SRC could potentially suspend every single requirement contained in the Charter School Law. It could, for example, suspend the provisions governing the funding formula for charter schools contained in Section 17-1725-A and do away with the School District's obligation to pay charter schools at all.

Brief for Petitioner at 36-38 (footnotes and citations omitted).

The Distress Law gives the SRC these broad powers pursuant to a generalized legislative objective of mitigating the School District's adverse financial circumstances. For the reasons given above, we do not view such objective as supplying either a constitutionally adequate guiding standard or an effective channeling mechanism relative to the SRC's discretionary suspension powers.

Finally, we find unavailing Respondents' suggestion that the non-delegation rule does not presently apply because only statutory suspensions are involved, and such

suspensions are authorized by Article I, Section 12. That provision's implication that suspensions may only occur per legislative authorization does not alter the restrictions on delegating legislative decision making as embodied in Article II, Section 1.

In summary, we hold that Section 696(i)(3) of the School Code, 24 P.S. §6-696(i)(3), is unconstitutional as it violates the non-delegation rule of Article II, Section 1. Accordingly Respondents' actions taken pursuant to that provision are null and void, and Respondents are permanently enjoined from taking further action under the authority it confers.[9]

Mr. Justice Eakin did not participate in the consideration or decision of this case.

Madame Justice Todd and Messrs. Justice Dougherty and Wecht join the opinion.

Mr. Justice Baer files a dissenting opinion in which Madam Justice Donohue joins.

---

[9] A permanent injunction may issue where a party establishes a clear right to relief and there is no adequate redress at law. *See Buffalo Twp. v. Jones*, 571 Pa. 637, 644, 813 A.2d 659, 663 (2002). That standard is satisfied here.